**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
OF THE WESTERN DIVISION
CINCINNATI OFFICE**

| | |
|---|---|
| TARIK JAHEIM DEAN,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>EQUIFAX INFORMATION SERVICES, LLC,<br><br>　　　　　　　　Defendant. | **Civil Action No.: 1:23-cv-423**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Tarik Jaheim Dean ("Plaintiff") a living, breathing 21-year-old consumer, brings this action on an individual basis, against Defendant Equifax Information Services, LLC ("Equifax") and states as follows:

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the national consumer reporting agencies

acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. The CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and

>unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of Equifax's blatantly inaccurate credit reporting, wherein Equifax reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

12. Accordingly, Plaintiff brings claims against Equifax for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

13. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Equifax for its willful and/or negligent violations of the FCRA as described herein.

**PARTIES**

14. Plaintiff is a natural person residing in Cincinnati, Ohio, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15. Equifax is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Ohio, including within this District. Equifax is registered to accept service through Corporation Service Company, located at 2 Sun Court, suite 400, Peachtree Corners, Georgia 30092.

16. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

**JURISDICTION AND VENUE**

17. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**FACTUAL ALLEGATIONS**

**Summary of the FCRA**

19. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

22. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to

ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### Equifax's Practices Concerning the Sale of Reports on the "Deceased"

24. Equifax sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

25. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Equifax are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Equifax must maintain reasonable procedures to assure that consumer reports are sold only for legitimate 'permissible purposes."

27. Equifax routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

28. Equifax's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

29. Equifax does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

30. Equifax does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31. Equifax does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32. In some cases, in order to assure accuracy, Equifax may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Equifax does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

33. Equifax regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Equifax does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

34. Equifax will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

35. Equifax fails to employ reasonable procedures that assure that a consumer with a "deceased" mark on his report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

36. Even in instances where other data on the face of the consumer's report indicates that he is not deceased, Equifax does not employ any procedures to assure that a consumer with a "deceased" mark on his report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

37. Even in instances where the purportedly deceased consumer communicates directly with the Equifax, Equifax does not employ any procedures to assure that a consumer with a "deceased" mark on his report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

38. Once a "deceased" mark is placed upon a consumer's report, Equifax will not calculate and will not provide a credit score for that consumer.

39. Even though Equifax will sell reports with a "deceased" mark, Equifax will not calculate or provide a credit score for that consumer that is the subject of the report, rather only providing "N/A" for the consumer's credit score.

40. Equifax knows that third-party credit issuers require a credit score in order to process a given credit application.

41. Equifax knows that consumers without credit scores are unable to secure any credit from most credit issuers.

42. Equifax knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

43. Equifax has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Equifax is inaccurately reporting them as "deceased" and without a credit score.

44. Equifax has received and documented many disputes from consumers complaining that Equifax had erroneously marked them as "deceased" on their credit reports.

45. Equifax knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code, even when said consumers are not on the Death Master File and are in fact alive.

46. Nevertheless, Equifax does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

47. Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance decides to change the code.

48. Equifax does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

49. Nor does Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

50. For years after a consumer's actual death, Equifax will continue to sell credit reports about that consumer.

51. Equifax will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

52. Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

53. Equifax profits from the sale of reports on deceased consumers.

54. Equifax has in its credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

55. Equifax knows that truly deceased consumers do not apply for credit.

56. Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

57. Equifax knows that identity theft and credit fraud are serious and widespread problems in our society.

58. Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

59. Equifax has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

60. Equifax sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

61. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Equifax to sell their credit reports, absent a court order.

62. Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### Plaintiff Applies for a TruPartner Credit Union Credit Card

63. In early 2022, Plaintiff was interested in taking steps to establish credit.

64. As a young person, Plaintiff was aware that he had no credit history, and was further aware of the important role that credit can play as it relates to a consumer's financial state.

65. With no credit history, Plaintiff determined that the best place to start would be obtaining a credit card and making timely payments.

66. Accordingly, in or around May 2022, Plaintiff completed an application for a credit card through his bank, TruPartner Credit Union ("TruPartner").

67. Plaintiff was an existing TruPartner customer and enjoyed his banking relationship with TruPartner.

68. Plaintiff was particularly excited about his opportunity to obtain a credit card in order to establish his credit profile, use the credit card for his daily needs, and in case of emergency.

### TruPartner Credit Union Denies Plaintiff's Credit Card Application

69. On or about May 12, 2022, Plaintiff was informed via email that TruPartner had denied Plaintiff's credit card application.

70. Plaintiff had no negative credit accounts and wondered if there was some sort of error that caused the denial.

71. Upon speaking with a TruPartner representative, Plaintiff learned that his credit application had been denied because Equifax had reported that Plaintiff was deceased.

72. Plaintiff was horrified to learn that TruPartner had not only denied his credit application but had done so because Equifax was erroneously reporting that Plaintiff was "deceased."

73. Plaintiff, who continued to live and breathe, assumed that a mistake had been made, and expected that the mistake would be easy enough to fix.

74. Later the same week, Plaintiff visited TruPartner in person to attempt to get his problem resolved.

75. Upon visiting TruPartner in person, TruPartner asked Plaintiff to confirm his full Social Security Number.

76. After Plaintiff's full Social Security Number had been confirmed, TruPartner attempted to request Plaintiff's credit report once again.

77. Despite confirming Plaintiff's full Social Security Number, TruPartner communicated to Plaintiff once again – this time in person – that Plaintiff's credit application could not be approved because Equifax's records reflected that Plaintiff was "deceased."

78. Plaintiff was distraught. Moreover, given Plaintiff's limited knowledge concerning the world of credit, Plaintiff had no idea what could be done to correct Equifax's reporting of Plaintiff as "deceased."

79. In or around January 2023, Plaintiff's automobile broke down so severely that the vehicle would no longer start. After having his car towed to an auto mechanic, Plaintiff learned that it would be several thousand dollars to get his vehicle running once again.

80. Due to the age of Plaintiff's vehicle, Plaintiff determined that it made more sense to simply purchase a new vehicle. However, Plaintiff recognized that he would need to utilize an automobile loan as he could not afford to purchase a vehicle in cash outright.

81. Therefore, in or around January 2023, Plaintiff attempted to obtain copies of his credit reports to determine whether he would be able to secure an auto loan.

82. Unfortunately, Plaintiff was unable to secure copies of his credit reports.

83. Upon information and belief, Plaintiff was unable to obtain copies of his credit reports because one or more of the credit bureaus was reporting Plaintiff as "deceased."

84. After several phone calls to the major credit bureaus – Equifax, Experian, and Trans Union – trying to resolve this ongoing issue, a representative from one or more of the major credit bureaus communicated to Plaintiff that the most likely source of the inaccurate "deceased" notation was the Social Security Administration ("SSA"), and that therefore Plaintiff should take the issue up with the SSA.

85. On or about February 5, 2023, Plaintiff visited his local SSA office and told the SSA that he believed the SSA's files reflected that Plaintiff was "deceased." To Plaintiff's surprise, the SSA explained to Plaintiff that its files do not reflect any "deceased" notation as associated with Plaintiff and offered to mail Plaintiff a new Social Security card – an offer which Plaintiff accepted.

86. As a result of the "deceased" notation appearing in Plaintiff's credit file, Plaintiff was deterred from completing an automobile application, as Plaintiff knew any such application would be unsuccessful.

87. As a result of Plaintiff's inability to apply for an auto loan, Plaintiff was forced to pay out of pocket to cover the expenses associated with fixing his existing automobile – money Plaintiff would have preferred to put toward a down payment on a new vehicle.

88. As a result of the inaccurate reporting by Equifax, Plaintiff sustained severe emotional distress.

89. Specifically, Plaintiff sustained a substantial amount of anxiety and distress concerning the "deceased" notation that was appearing in Plaintiff's Equifax credit report. For months, Plaintiff had genuine fears that his Equifax credit report would simply never be fixed, and that Plaintiff would be unable to obtain any credit at all.

90. Moreover, Plaintiff was embarrassed and humiliated by his inability to obtain credit. Plaintiff has watched as his friends have purchased new cars and obtained credit cards, and has been extremely frustrated that he has been unable to make similar advances in his own life.

91. As a byproduct of the anxiety and distress Plaintiff suffered, Plaintiff endured sleepless nights wherein he found himself frequently unable to fall asleep and/or stay asleep throughout the night.

92. In or around June 2023, Plaintiff applied for a Capital One credit card and was approved.

93. Upon information and belief, one or more of Plaintiff's phone calls to Equifax, Experian, and/or Trans Union was understood to be a dispute, and the reinvestigation of that

dispute resulted in the correction of the "deceased" notation which plagued Plaintiff's credit file for nearly a full year.

94. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

95. As a result of the "deceased" notation, Equifax made it practically impossible for Plaintiff to obtain credit.

96. At all times pertinent hereto, Equifax was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Equifax herein.

97. At all times pertinent hereto, the conduct of Equifax as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

98. Equifax is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Equifax's violations of the FCRA are willful.

99. As a result of Equifax's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

100. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

101. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

102. On numerous occasions, Equifax prepared patently false consumer reports concerning Plaintiff.

103. Despite actual and implied knowledge that Plaintiff is not dead, Equifax readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

104. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

105. As a result of Equifax's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

106. Equifax conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court

pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

107. Plaintiff is entitled to recover attorneys' fees and costs from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

i. Determining that Equifax negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Date: July 10, 2023

**COZMYK LAW OFFICES, LLC**
**OF COUNSEL FOR CONSUMER ATTORNEYS**
*/s/ Peter Cozmyk*
Peter Cozmyk (#0078862)
6100 Oak Tree Blvd., Suite 200
Independence, OH
P: (877) 570-4440
F: (216) 485-2125
E: pcozmyk@cozmyklaw.com

*Attorneys for Plaintiff Tarik Jaheim Dean*